**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 06-20373-CR-LENARD/TORRES**

**UNITED STATES OF AMERICA**

**v.**

**NARSEAL BATISTE, et al.**

**Defendants.**

_____/

**GOVERNMENT'S SENTENCING MEMORANDUM AND RESPONSE TO**
**DEFENDANTS' OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORTS**

The United States of America, through the undersigned Assistant United States Attorneys, files this Sentencing Memorandum, which includes our response to the Defendants' Objections to Presentence Investigation Reports (PSIs) in this case. In this memorandum, we first address the defendants' unconvincing objections to the Probation Office's Guidelines calculations. We then address the defendants' unpersuasive requests for a departure on various grounds. Finally, we explain why the advisory Guidelines sentence for all defendants were properly calculated and reasonable and consistent with the statutory sentencing factors in 18 U.S.C. § 3553.

For months, these defendants stood before a jury in this District, disputing the same facts and raising the same weak arguments they offer today in hopes of leniency. The jury properly and soundly rejected those arguments. The Court should now impose sentences on these defendants that are consistent with the verdicts and the seriousness of their crimes.

- 1 -

**<u>Background</u>**

On May 12, 2009 the third trial of this case ended in the conviction of Narseal Batiste on all four counts of the indictment; Patrick Abraham on counts 1, 2 and 3 and Stanley Phanor, Rotschild Augustine, and Bursin Augustin on counts 1 and 2.  Count 1 of the indictment charges a conspiracy to provide material support to a designated terrorist organization in violation of Title 18, United States Code, Section 2339B; Court 2 of the indictment charges a conspiracy to provide material support to terrorists in violation of Title 18, United States Code, Section 2339A; Count 3 charges a conspiracy to destroy by means of explosives property used in interstate and foreign commerce in violation of Title 18, United States Code, Section 844(n); and Count 4 charges a seditious conspiracy, in violation of Title 18, United States Code, Section 2384.

The Probation Office has prepared separate PSIs for each defendant.  The offense conduct section of each defendant's PSI is identical.  The PSI for defendant Batiste calculates his guideline sentence at life imprisonment; however, the statutory maximum term of imprisonment is 840 months.  Batiste's PSI recommends Guidelines enhancements for terrorism and for aggravating role. The PSI for defendant Abraham calculates his guideline sentence at 360 months to life imprisonment; however, the statutory maximum term of imprisonment is 600 months.  Abraham's PSI does not include a role adjustment or obstruction of justice enhancement but does impose a terrorism enhancement.  The PSIs for defendants Stanley Phanor, Burson Augustin, and Rotschild Augustine calculate each of their guideline sentences at 360 months imprisonment with the statutory maximum at 30 years imprisonment.  Their PSIs also do not include any role adjustments, but impose the terrorism enhancement.

Each defendant has objected to his PSI, challenging all of the enhancements and seeking role

reductions and downward departures.  The arguments raised in their objections demonstrate that the defendants still have no conception of the seriousness of their crimes.  Fortunately the jury did not share that view.  In all respects, the Court should overrule the defendants' PSI objections, deny their departure requests, and sentence the defendants to the statutory maximum terms of imprisonment, a punishment that would be within their properly-calculated advisory Guidelines range and supported by the factors in § 3553.

### Sentencing Procedures and the Format of this Memorandum

The United States recognizes, of course, that the Sentencing Guidelines are now advisory, and that a defendant's sentence must be consistent with the factors set forth in 18 U.S.C. § 3553. *See United States v. Booker*, 543 U.S. 220, 245 (2005).  Nonetheless, even after *Booker*, the advisory Sentencing Guidelines remain an important (and indeed mandatory) consideration.  The Eleventh Circuit has emphasized that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."  *United States v. Scott*, 426 F.3d 1324, 1330 (11th Cir. 2005)*; see also United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005) (court should calculate the sentencing range "correctly" even though it is only advisory).  As the Supreme Court itself recently held, the Guidelines generally can be assumed to be a "rough approximation" of a sentence that would "achieve § 3553(a)'s objectives."  *Rita v. United States*, 127 S. Ct. 2456, 2458 (2007).

As a first step in sentencing, therefore, a court must look to the PSI and properly calculate the defendant's advisory Guidelines range.  To that end, in Section I of this memorandum, we discuss the defendants' myriad factual objections to the offense conduct section of the PSIs.  This discussion pertains to all defendants, as the offense conduct section is the same for each.  We turn

next, in Section II of this memorandum, to the specific enhancements challenged by the defense.[1]

Initially we address the one enhancement applied uniformly to all defendants, which is the terrorism

enhancement in USSG § 3A1.4.  We then address separately the defendants' varying objections

about their role in the offense under USSG §§ 3B1.1 and 2.

Next, in Section III of this memorandum, we address the defendants' requests for a departure

from the Guidelines range.  As this Court is aware, departures continue to be part of the sentencing

process, since the Court must consider any departure requests in setting the advisory Guidelines

range.  *See United States v. Jordi*, 418 F.3d 1212, 1215 (11th Cir. 2005).  Additionally, we will

address the § 3553 factors, and explain why the statutory maximum terms of imprisonment are

reasonable sentences that should be imposed in this case.

**<u>Argument</u>**

I.     **The Defendants' Objections to the Offense Conduct Section of the PSIs Either
       Contradict the Verdict, Are Incorrect or Need Not Be Addressed.**

Each defendant posits a long list of factual objections to paragraphs in the offense conduct

section, which collectively and, in some instances, individually, amount to a general denial of

criminal wrongdoing.  The offense conduct section is based on facts taken directly from the

evidence, and this section consists of either the literal words that were spoken or other

uncontroverted facts, such as the words contained in certain documents.  The PSI does not contain

"inferences" or one-sided versions of events.  Instead, it includes a straightforward rendition of the

evidence without shading or slanting the facts to make them inconsistent with the jury's verdicts.

---

[1]  The government does not have any objections of its own to the offense level
calculations of the PSI.  Depending upon the Court's rulings, however, we reserve the right to
seek any departure necessary to ensure that the defendants' advisory Guidelines range remains as
it stands now.

To be sure, the defense in this case was premised on the unfounded belief that the government was misinterpreting the literal words of the defendants and their associates, but the time has now passed for the defense trying to argue the best face of unfavorable evidence.

The jury has rendered its verdict, which is consistent with the government's view of the facts. This view of the facts, and the verdict itself, has been judicially sustained under Fed. R. Crim. P. 29, and the defendants cannot now relitigate the trial evidence in the guise of PSI objections. *See United States v. Schlaen*, 300 F.3d 1313, 1318 (11th Cir. 2004) (quoting *United States v. Costales*, 5 F.3d 480, 488 (11th Cir. 1993)) ("[A] district court cannot use the post-trial sentencing process to call a jury's verdict into question."); *see also United States v. Thayer*, 204 F.3d 1352, 1356 (11th Cir. 2000) (holding that district court cannot grant relief at sentencing that "completely nullifies the effect of the jury finding" of guilt).

Thus, rather than undertake a point-by-point refutation of the defendants' voluminous objections, it is possible to view the objections through the lens of the following three-part framework:

- **<u>First</u>**, to the extent that the defendants want to add <u>facts</u> to the offense conduct section based on things said or evidence introduced at trial (as opposed to arguments or inferences about what certain statements mean, etc.), this Court can make those <u>facts</u> part of the PSI record. The government has no objection to this procedure, provided these are true facts and not jury arguments about what previously-admitted trial evidence means.

- **<u>Second</u>**, to the extent that the defendants are making inferences and arguments based on trial evidence that is contrary to, or inconsistent with, the

jury's verdicts, this Court cannot adopt them and any related defense objections should be denied.  This is the point of the *Schlaen* and *Costales* cases, cited above.

● **<u>Third</u>**, to the extent that any particular disputed fact is the linchpin of a particular enhancement and is not necessarily encompassed by the jury's verdicts, the government is prepared to call this Court's attention to the trial record or introduce additional evidence, or both, so that this Court can make a specific determination as to the meaning and significance of such evidence *<u>in the context of the specific enhancement at issue</u>*.

Defendants objections constitute either outright denials of criminal wrongdoing, or are otherwise inconsistent with the jury's findings.  Examples of denials of guilt are Batiste's objection ". . . to all references throughout the PSI wherein it states that he agreed to work under the direction and control of al-Qaeda," (Batiste's objections at pg 2); and Abraham's objection "to the entire Offense Conduct section contained in paragraphs 2 through 54" (Abraham's objections at pg 1, para 1).  These claims of innocence were made and rejected by the jury.  Other objections pertain more specifically to the conduct of the defendants themselves, but still fall into the category of objections inconsistent with the jury's verdicts.  These objections either advocate a competing, more favorable inference for individual pieces of evidence (*i.e.*, Batiste's and R. Augustine's objections that "back home" was a reference to "al Qaeda;" that Batiste sought money from the informants to form a local religious and civic organization.)  These objections ignore the principles set forth in *Schlaen* and *Costales*, which indicate that, by returning guilty verdicts on a conspiracy to provide material support to Al Qaeda, the jury found that defendants agreed to provide their services to, and under

the direction and control of, Al Qaeda.  Either way, the defendants use their objections as a mechanism for attempting to undermine the jury's conclusions.  The jury's verdict contained no skepticism or rejection of the government's allegations, either as set forth in the indictment or as proven at trial.  The defense does not now have the latitude to seek a lower sentence based on a view of the isolated pieces of evidence, or of the case in general, that is inconsistent with the guilty verdicts.

Although the foregoing establishes the basic principles and general framework for considering the defendants' factual objections, the government will be prepared to address specific objections at the sentencing.  Fed. R. Crim. P. 32(i)(3)(B) may be read to require a sentencing court to consider each specific factual objection, though the rules themselves must be read in conjunction with case law placing the burden on the defendant to lodge valid objections that do not simply seek to relitigate the jury's verdict.  Here, most if not all of the defendants' objections seek to dispute the jury's conclusions about the underlying facts of the case, and therefore this Court need do no more than note the inconsistency with the jury's verdict and its inability to use a competing view of the facts to reduce the sentence.  Rule 32(i)(3)(B) itself allows this Court to skirt any factual resolution on a disputed issue if the fact at issue would not, or could not, affect the ultimate sentence.  And the foregoing cases do not allow this Court to calculate a sentence, with the jury having now returned guilty verdicts, by taking disputed facts in the light most favorable to the defendants.

## II.     The PSIs Properly Calculate the Defendants' Advisory Guidelines Range.

### A.      The terrorism sentencing enhancement should be applied.

Defendants' objections to the "terrorism enhancement" of USSG § 3A1.4 are meritless.  Section 3A1.4(a) calls for an increase in the defendant's offense level and Criminal History category

if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." The enhancement reflects the fact that persons who support terrorism, or align themselves with terrorists, represent a unique danger to the community, and are less likely than others to be rehabilitated. *See United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003) (noting that " terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus . . . terrorists and their supporters should be incapacitated for a longer period of time").

By its terms, the enhancement applies whenever one or more offense of conviction involved or was intended to promote a "federal crime of terrorism."  USSG § 3A1.4(a).  The Guidelines define "federal crime of terrorism" by referring to 18 U.S.C. § 2332b(g).  *See* USSG § 3A1.4, comment (n.1).  That statute, in turn, defines "federal crime of terrorism" as any offense that "is calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct" and that violates one of a number of specified federal statutes. 18 U.S.C. § 2332b(g)(5); *Haouari* v. *United States*, 429 F. Supp. 2d 671, 682 (S.D.N.Y. 2006).

Accordingly, to apply the enhancement in USSG § 3A1.4, the Court must make a legal as well as a factual determination.  The Court must first determine, as a matter of law, whether the offense of conviction implicates one of the specified federal statutes that *could* give rise to a "federal crime of terrorism."  This requirement may be met in one of two ways:  either (1) the offense of conviction is actually among the statutes listed in 18 U.S.C. § 2332b(g), or (2) the offense otherwise involved, or was intended to promote, a violation of one of those statutes.   In the second stage of the analysis, the Court must determine whether the offense *is* a federal crime of terrorism because it was "calculated to influence or affect the conduct of the government by intimidation or coercion,

– 8 –

or to retaliate against government conduct." There can be no dispute that these requirements are met here.

> **1.      Each offense of conviction in this case implicates a specified federal statute that supports the terrorism enhancement.**

Each count of conviction in this case could trigger the terrorism enhancement. Most straightforward are Count One, which alleges a violation of 18 U.S.C. §2339B and Count Two, which alleges a violation of 18 U.S.C. § 2339A.  18 U.S.C. § 2332b(g) expressly identifies sections 2339B and 2339A as offenses supporting the terrorism enhancement.  All defendants were found guilty of these two Counts.  As such, there is no question that defendants' convictions on Counts One and Two could support the enhancement in this case.  No further analysis is needed, because one qualifying offense is enough.  Defendants' assertions that the terrorism enhancement is double-counting is simply inconsistent with the plain wording of the statute and the Guidelines.

Batiste's and Abraham's convictions on Count Three – conspiracy to destroy buildings by use of explosives, a violation of 18 U.S.C. §844(n), and Batiste's conviction on Count Four – seditious conspiracy, a violation of 18 U.S.C. § 2384 – also support the enhancement.  The Eleventh Circuit recognized that the terrorism enhancement could apply even though the offense of conviction was a conspiracy charge that was not among the list of enumerated offenses, so long as the underlying crime *was* among those listed.  *See United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004).  As the panel explained in that opinion:

> A "federal crime of terrorism" is defined as any offense that: (1) "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"; and, (2) is one of the offenses listed in 18 U.S.C. § 2332b(g)(5)(B). 18 U.S.C. § 2332b(g)(5)(A).  The object of Mandhai's conspiracy - destroying buildings used in interstate commerce by fire or explosives under 18 U.S.C. § 844(I) - is specifically listed as a federal terrorism crime in 18 U.S.C. § 2332b(g)(5)(B). But conspiracy to do so under 18 U.S.C. §

- 9 -

844(n) is not.  In light of this, Mandhai argues, he did not commit a federal crime of terrorism to which the enhancement applies.

We reject the argument. . . . Had the Guideline drafters intended that § 3A1.4 apply only where the defendant is convicted of a crime listed in 18 U.S.C. § 2332b(g)(5)(B), they would have included such limiting language. Instead, they unambiguously cast a broader net by applying the enhancement to any offense that "involved" or was "intended to promote" a terrorism crime. The term "involve" means to "include." *United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2001). The phrase "or intended to promote" in turn, must have additional meaning. *See United States v. Drury*, 344 F.3d 1089, 1099 (11th Cir. 2003) (statutes must be read so that no words are discarded as meaningless, redundant, or surplusage).  In ordinary usage, to "promote" means "to bring or help to bring . . . into being. . . ."  Webster's Third New Int'l Dictionary, p. 1815 (1976).  Under a plain reading, the phrase "intended to promote" means that if a goal or purpose was to bring or help bring into being a crime listed in 18 U.S.C. § 2332b(g)(5)(B), the terrorism enhancement applies. *Graham*, 275 F.3d at 516-18.

375 F.3d at 1247-48.  S*ee also United States v. Hale*, 448 F.3d 971, 988 (7th Cir. 2006) (applying enhancement where the offenses of conviction themselves were not listed in § 2332b(g), but the underlying conduct was meant to promote an offense that was listed in that section).  In short, each count of conviction for each defendant in this case supports the terrorism enhancement.

**2.     The defendants' conduct was "calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct."**

Defendant Abraham complains that he government failed to prove, by clear and convincing evidence, that his conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," such that his offenses constitute federal crimes of terrorism.  The evidence supporting all of the defendants intentions to influence or affect the conduct of government by intimidation or coercion is overwhelming and indeed was adopted by the jury's verdict.

Among the evidence presented was: testimony of government agents, government informants, an expert witness, a reluctant witness, Mick Coriolan who had been recruited to join

defendants' organization[2]; audio and video recordings of defendants, including a recording of the defendants taking an oath of loyalty to Al Qaeda; photographs and video footage taken by defendants of the FBI building and federal buildings in downtown Miami; and lists of materials needed such as weapons, vehicles, and cash, provided by Batiste to the informants. This evidence amply supported that Batiste wanted to wage violent war, or "jihad," against the United States government. In order to accomplish this objective, Batiste formed and trained an army of soldiers to wage this war – defendants voluntarily agreed to join his military-style and cult-like organization. In order to fund this mission, Batiste sought the assistance of a foreign terrorist organization, in doing so, he was emulating a man by the name of Jeff Fort, who was found guilty of terrorism charges in the 1980s in connection with a plan to provide material support to Libya in exchange for $2 million. The evidence showed that the originator of this plan was Batiste, not a government agent or informant. Some of the voluminous amounts of evidence presented in this case were the following:

• Early on in the investigation, on November 7, 2005, Burson Augustine met with an informant and discussed the defendants' plan to engage in coordinated attacks in different areas around Miami with the ultimate goal of "not just taking over Miami. . . taking over Allah's world, with his help. . ." GX #41 & 41A.

• On December 16, 2005, Batiste met a person (CW) that he believed was a representative of Al Qaeda and he told that person that his mission was to build an "Islamic Army" to wage jihad. Batiste compared himself to Jeff Fort, who he explained had also sought funding and support from

---

[2] Coriolan testified that he grew concerned about Batiste and his group of men (the co-defendants) because he saw that they were forming a "movement" to "take over . . . the United States of America." (TT dated March 5, 2009 at pgs 115-117).

a terrorist organization.  GX #44, 44A-B.  Batiste gave that person a list of materials, which included uniforms, boots, machine guns, radios and vehicles.  GX #100.  Shortly thereafter, Batiste provided another list with more specific weapons requests.  GX #101.

• On December 22,2006, in a meeting with the CW, Batiste mentioned for the first time his plan to destroy the Sears Tower. In that meeting, Batiste mentioned his familiarity with Chicago and access routes to the Sears Tower, explaining that he had once worked for Fed-X in Chicago.  GX #47 & 47A.  He also provided the CW with a list of boot sizes for his soldiers.  GX #102.

• On December 29, 2006, Batiste again met with the CW and discussed his plan to blow up the Sears Tower, citing his experience in the construction field and his familiarity with razing buildings, he considered using dynamite or a more powerful explosive that would achieve his goal. Batiste also received the boots and provided the CW with another list of materials needed, providing specific makes and models of machine guns and other weapons.  GX #103, 103A-C.

• On January 28, 2006, the defendants Abraham, Phanor, Burson Augustin, and Rotschild Augustine met with the informants in order to take them against their will to the Keys to meet with Batiste – in an effort to determine if the informants were working with the government and to gain control over the informants.  When the informants ultimately met with Batiste in a secret hideaway inside of a tent, Batiste explained why he was in hiding and expressed his concern that the U.S. was investigating "domestic terrorism" and that he "didn't wanna be a fool and be caught."  GX #55 & 55A.

• On February 19, 2006, in a meeting with the CW and Patrick Abraham, Batiste discussed, among other things, their plan to "launch a full ground war," which would be "just as good or greater than 9/11."  GX #56, 56A-C.

• On March 10, 2006, Batiste swore an oath of loyalty to Al Qaeda.  GX #61 & 61A.

•  On March 16, 2006, all of the defendants swore an oath of loyalty to Al Qaeda. Also at this meeting, in the presence of all defendants, the CW outlined a fictitious plan to conduct coordinated attacks against FBI buildings in five cities, including the FBI building in North Miami Beach. Batiste received a video camera to accomplish the task of recording the FBI building to assist in the bombing plot.  GX #69, 69A-C.

• On March 23, 2006, in a private telephone conversation between Batiste and Abraham, they discussed having to "survive on this mission" and that they would have to be prepared to evacuate because "when the call is made, the call is made – there could be flight at night."  GX #W2-01932 & W2-01932A.

•  On March 24, 2006 in furtherance of this plot, Abraham and Batiste drove the CW past the FBI building, the National Guard Armory, and a Jewish Synagogue, discussing them as potential targets for Al Qaeda; they also purchased a memory chip for a digital camera.  GX #72 & 72A.

• On March 25, 2006, also in furtherance of this plot, Batiste, Phanor and Rotschild Augustine were observed taking photographs of federal buildings in downtown Miami.  Surveillance photographs taken of the three of them were introduced into evidence.  GX #35A-H.

• On April 6, 2006, after taking photographs of the FBI building, and photographs and video footage of the James Lawrence King Federal Justice Building, federal courthouse buildings, the Federal Detention Center, and the Miami Police Department, Batiste and Burson Augustine provided the photographs (GX #121 & 121A) and video footage (GX #120 & 120A) to the CW and discussed the Al Qaeda plan.  GX #91, 91A-C.

Indeed, the jury's verdict already encompasses a finding that the defendants intended to

affect or retaliate against governments.  Paragraph 1 of the Indictment discusses al Qaeda as "an international terrorist group which is dedicated to opposing non-Islamic governments by encouraging and promoting jihad."  Paragraph 2 of the Indictment defines "jihad" as "violent jihad, which in turn refers to the taking of actions against persons or governments in order to undermine and bring about the downfall of governments. . ."  Defendants were all convicted in Count 1 of providing material support to al Qaeda "knowing that al Qaeda has engaged or engages in terrorist activity."  Given these allegations, the jury's verdict necessarily encompasses a finding that the defendants' actions were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  That finding brings these offenses easily under the definition of "federal crime of terrorism."  To reach a different conclusion at sentencing would contradict the verdict and be improper.  To reiterate the words of the Eleventh Circuit:  "'[A] district court cannot use the post-trial sentencing process to call a jury's verdict into question.'" *United States v. Schlaen*, 300 F.3d 1313, 1318 (11th Cir. 2004); *see also United States v. Dowell*, 430 F.3d 110, 1110-1111 (10th Cir. 2005) (applying terrorism enhancement at sentencing based upon jury's implicit finding that the defendant meant to interfere with actions of government agency).

Defendants' claims that they didn't have the ability to carry out specific terrorism crimes are meritless.  As stated by the Eleventh Circuit in *Mandhai*, "the terrorism enhancement does not hinge upon a defendant's ability to carry out specific terrorist crimes of the degree of separation from their actual implementation.  Rather , it is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered."  375 F.3d at 1248.  Moreover, the Seventh Circuit in *United States v. Christianson*, 2009 WL 3718736 (Nov, 9, 2009) very recently

affirmed the district court's application of the terrorism enhancement against a member of the Earth Liberation Front who was convicted of destruction of government property. The Seventh Circuit found that even if the purpose behind defendant's actions was to "save our earth from destruction," the fact that the defendant attempted "to further his views by a system of coercive intimidation," sufficiently defined him as a terrorist, rendering the enhancement appropriate even when the crime was "purely domestic and did not transcend national boundaries."

Defendant Abraham incorrectly argues that the government's burden of proof for this enhancement is the clear and convincing evidence standard. Our proof easily satisfies any standard of proof (and as noted above, the jury's finding of guilt beyond a reasonable doubt on the indictment implicitly includes a finding that the requirements of the enhancement are met). That said, the ordinary preponderance-of-the-evidence standard to the terrorism enhancement apply just as they do in making other factual findings at sentencing. *See United States v. Awan*, 2007 WL 2071748 at *3 (E.D.N.Y. Jul. 17, 2007); *see also United States v. Graham,* 275 F.3d 490, 517 (6th Cir. 2001) (same); *United States v. Salim*, 287 F. Supp. 2d 250, 324 (S.D.N.Y. 2003) (same).

There is no case law in the Eleventh Circuit allowing this Court to deviate from the normal preponderance standard for purposes of the terrorism enhancement. What's more, the Eleventh Circuit has already rejected case law from elsewhere suggesting that a higher burden of proof should be used when resolution of a particular factual dispute at sentencing will have an allegedly disproportionate effect on the ultimate sentence. *See United States v. Whitesell*, 314 F.3d 1251, 1255 (11th Cir. 2002) (summarily rejecting argument for clear-and-convincing standard despite the significant impact of an enhancement upon the defendant's sentence, because "'a federal defendant's due process rights are satisfied by the preponderance of the evidence standard'") (quoting *United*

*States v. Jackson*, 57 F.3d 1012, 1019 (11th Cir. 1995)); *United States v. Lewis*, 115 F.3d 1531, 1537 (11th Cir. 1997) (expressly declining to follow case law from other Circuits applying a clear-and-convincing standard to certain sentencing factors); *cf. also United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005) (re-affirming preponderance standard after *Booker*).  The Guidelines themselves call for use of a preponderance standard, and do not carve out an exception for the terrorism enhancement.  *See* USSG § 6A1.3, cmt. ("use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case").  There is no support in the Guidelines or binding Eleventh Circuit precedent to deviate from the norm and impose a higher standard in this case – nor would such a standard make the enhancement any less applicable here.

In sum, all of the criteria for the terrorism enhancement in USSG § 3A1.4 are met in this case.  The Court should adopt the PSI on this issue, and overrule the defendants' objections.

**B.    The PSIs correctly assess each defendant's role in the offense.**

Batiste does not, and cannot, object to the four-level increase based on his managerial and supervisory role.  The remaining defendants object to the absence of a mitigating role, asserting that they are less culpable than most other participants.

Burson Augustin, Rotschild Augustine, Stanley Phanor and Patrick Abraham followed Narseal Batiste as soldiers in a paramilitary organization.  They understood and believed that he claimed some divine authority.  They could easily have chosen not to follow Batiste's teachings but they, unlike Mike Coriolan, willingly signed onto Batiste's lethal plan.  Early on in the investigation which led to this prosecution, Burson Augustine explained to the informant how their group had to hide their secret mission from the authorities:

### November 7, 2005 - GX#s: 41 & 41A, pgs. 30-31

BA:    Anything we do, just by me taking the receipt from the lady and paying her, I'm saying...it is alright and it's okay...What the government is doing. I'm supporting the government.

CW1:  That's right. That's right.

BA:    So okay, I can, am I at fault at that? 'Cuz I gotta blend in, like it's, do stuff by his way, you gotta blend in. You can't be too outrageous.

CW1:  Exactly.

BA:    But am **I blending in, I'm gonna destroy you.**

CW1:        What?

BA:    That's the only reason why I'm blending in,...

Burson Augustine went on to explain what their plan was:

### November 7, 2005 - GX#s: 41 & 41A, pg. 20

BA:    That's why we could make a big difference.

CW:   What?

BA:    Alright, people in this neighborhood, they get a plan. People live around uh, we, we get a plan. People Opa Locka, they get a plan. At 7:00...strike every neighborhood. Cops are going every which way, we gotta go to another state, same thing.

Shortly thereafter, Batiste himself provided more details to the informant about what he and the defendants were hoping to accomplish:

### November 21, 2005, GX #s: 43, 43A & 43B, pgs. 68-69

NB:    Believe that. It has to be more than just a bombing, it has to be a real ground war. Cause some how or another you have to get the civilians, you have to get the people involved, make them go crazy.

NB:    Well you make the people attack each other. Cause chaos.

NB:    (UI)...is we want the people to get hysterical, but we have to cause them to go into chaos, but it first starts small in the community if I can't make like for instance the area where we have the mosque, if we cannot take that area under control then how we gonna take all of Miami under control?

Batiste was consistent in his explanations of their goals and objectives:

### December 21, 2005 - GX #s: 46, 46A & 46B, pgs. 40-42

NB:    Sears Tower. It's the tallest building in world. It used to be the Empire State

Building (UI) Then you gotta get, you gotta get the buildings right here in Miami.  (UI) California, some in Texas.  That sounds impossible, but it can be done.  It can be done because they can be put on fire.  Burn them to the ground.  (UI) But whatever they take to burn them, whatever they take to destroy them, they gonna have to be destroyed.

**February 19, 2006 - pgs. 64-65**

NB:   No.  We'll make sure of that.  If we see them surviving we will shoot them...

**March 24, 2006 - pgs. 25-26**

NB:   Are we're gonna burn Miami Beach?
NB:   (SC) We'll set it on fire, hah?
NA:   That's great.  I need this war to come on.

As explained in more detail above, all of the defendants acted in concert with Batiste's leadership in agreeing to provide themselves to Al Qaeda in order to accomplish their violent goals.  Each of the defendants played important roles in this plan.  They coordinated their efforts in kidnaping the informants to ascertain whether they were working for the government; they all pledged an oath of loyalty to Al Qaeda; Abraham and Batiste drove the informant around Miami suggesting targets for Al Qaeda to blow up; Rotschild, Phanor, and Batiste took photographs and videos of Federal Buildings which they believed Al Qaeda wanted to target for destruction; and Burson was present and standing guard as a look-out for Batiste during several of his meetings with the informant in which the photographs and videos were provided and discussed.  They were all instruments of the scheme itself, indispensable and essential parts of the conspiracies.  As such, they are not entitled to any role reduction.  *See, e.g., United States v. Rotolo*, 950 F.2d 70, 71 (1st Cir. 1991) (Breyer, J.) (recognizing that "one, who say, points a gun at a bank teller and seizes the money is not entitled to a downward adjustment simply because someone else in the gang supervises his activities"); *see also United States v. Ravelo*, 370 F.3d 266 (2nd Cir. 2004) (denying minor role to

defendant gang member who pleaded guilty to conspiracy to commit assault in aid of racketeering and who provided the car, knew gang was going to attack rival gang, and provided support by his presence in the car even if he did not commit or intend to commit the assault himself); *United States v. Castano*, 224 F.3d 111 (2nd Cir. 2000) (denying minor role to defendant in a murder for hire scheme who showed photograph of victim to persons hired by husband to do the killing, identified victim at restaurant the night of the murders, coordinated payment of subcontractors, and received money for her participation).

C.   **Defendants' Other Objections to the Calculation of their Guidelines Range Are Meritless.**

1.   **Defendants do not qualify for a 3-point decrease of their base offense level pursuant to Section 2X1.1(b)(2).**

All of the defendants request a three level decrease in the sentencing guideline for conspiracies not covered by a specific offense guideline pursuant to Section 2X1.1(b)(2).  None of the defendants qualify for such a decrease.

First, Section 2X1.1(d)(1) specifically states that subsection (b) shall not apply to any offense that was "intended to promote, a federal crime of terrorism," specifically listing 18 U.S.C. §2339A as an excludable offense.  As explained by the Fourth Circuit Court of Appeals in *United States v. Abu Ali*, 528 F.3d 210, 264-265 (4th Cir. 2008):

> As the district court properly recognized, but failed to adequately appreciate, we cannot "wait until there are victims of terrorist attacks to fully enforce the nations's criminal laws against terrorism." To deviate on the basis of unrealized harm is to require an act of completion for an offense that clearly contemplates incomplete conduct.  By definition, conspiracy offenses do not require that all objects of the conspiracy be accomplished. The Guidelines appropriately recognize this fact: while they normally afford a three-level decrease for non-specific offense conspiracies that were not on the verge of completion, they specifically exclude from this decrease any conspiracies that involve or promote "a federal crime of terrorism."  *See* U.S.S.G. §2X1.1.

Essentially, defendants complain that their crime was not a completed act of terrorism because they did not succeed in destroying buildings, killing people, or other violent goals. This is not a valid argument warranting a three point reduction under the Guidelines.

As explained in the Probation Officer's response, the defendants multiple counts of conviction must be grouped pursuant to the rule for grouping multiple offenses, U.S.S.G. Sections 3D1.2 and 3D1.3. Count one, a violation of Title 18, United States Code, Section 2339B, is the most serious of the counts comprising the group for Burson Augustin, Rotschild Augustine, Stanley Phanor and Patrick Abraham. Count four, a violation of Title 18, United States Code, Section 2384, is the most serious count comprising the group for Narseal Batiste. Title 18, United States Code, Section 2339B is covered by its own specific offense guideline, Section 2M5.3 of the sentencing guidelines. Title 18, United States Code, Section 2384, seditious conspiracy or conspiracy to wage war against the United States, does not have a guideline promulgated for it and must rely on the application of the most analogous guideline pursuant to Section 2X1.5 of the sentencing guidelines. The United States Court of Appeals for the Second Circuit in *United States v Rahman*, 189 F.3d 88, 142-143 (2nd Cir. 1999) upheld the use of Section 2M1.1(a) of the sentencing guidelines as the most analogous guideline for violations for Title 18, United States Code, Section 2384. Section 2X1.1(c)(1) of the Sentencing Guidelines states in relevant part as follows:

> When a conspiracy is expressly covered by another offense guideline section, apply that guideline.

Therefore, because a violation of Title 18, United States Code, Section 2339B is covered by

its own guideline, Section, 2M5.3, and Title 18, United States Code, Section 2384 is covered by the most analogous guideline, Section 2M1.1(a), the three point decrease provided for in sentencing guideline Section 2X1.1(b)(2) does not apply to the defendants in this case.

Section 2X1.1(b)(2) states in relevant part as follows:

> If a conspiracy, decrease by three levels, <u>unless</u> the defendant or a coconspirator completed all the acts the coconspirators believed necessary <u>on their part</u> for the successful completion of the substantive offense.

The defendants before this court, according to the jury's verdict, agreed to provide material assistance to a terrorist organization and to terrorists. They provided themselves (they even went so far as to take an oath of loyalty to Al Qaeda) and their knowledge of the local area, photographs, videotapes, advice and directions. Batiste and Abraham gave a man they believed was the representative of Al Qaeda, a tour of locations to attack in South Florida, including a Jewish synagogue, a National Guard Armory and the Miami office of the FBI. Narseal Batiste, Stanley Phanor and Rotschild Augustine took video and still photos of the United States Courthouse in downtown Miami and still photos of the Miami office of the FBI to assist Al Qaeda in attacking those buildings. Narseal Batiste, in the presence of Burson Augustin who stood guard, reviewed all of these videos and photos with the man they believed was the representative of Al Qaeda and provided instructions to the Al Qaeda representative on how best to attack and destroy those buildings.

In short, all five of the defendants completed every act necessary on their part to successfully complete an attack on the United States Courthouse and the FBI building in downtown Miami. Defendants were all involved in jointly undertaken criminal activity and their conduct was within the specifically intended scope of the conspiracy to provide material support to a designated

terrorist organization.  Therefore, they completed all the acts they believed necessary to commit the substantive offense and as such, Section 2X1.1(b)(2) is not applicable.  *See, United States v. Alvarez*, 609 F. Supp 1313, 1316-17 (S.D. Fla. 2009).[3]

Finally, Batiste argues that he did nothing to wage war against the United States and that Section 2M1.1(a) of the sentencing guidelines should not be used as the most analogous sentencing guidelines section for count four.  First, as stated above, this position is contrary to the *Rahman* case.[4]  Additionally, Batiste's argument ignores his own words presented as evidence in this trial from which the jury found him guilty beyond a reasonable doubt of a conspiracy to wage war against the United States.  On March 5, 2009 recalcitrant witness, Mick Coriolan testified at pages 115 and 116 of the trial transcript as follows:

> Q.    Why didn't you follow him?
> A.    Because of that taking over stuff.  America is our country.
>       I was born and raised in Haiti and, you know, I seen different
>       people build their own movement.  I didn't want to come here
>       and build another movement.  I'm here for myself.  That's it.
>
> Q.    What was his movement about that concerned you?

---

[3]  The District Court in *Alvarez*, a mail fraud case, distinguished the facts of *United States v. Puche*, 350 F.3D 1137 (11th Cir. 2003), relied upon by Batiste.  *Puche* involved a conspiracy to launder $6 million, while the defendants had actually only laundered $714,500.  The *Alvarez* court noted "at the time of arrest, defendants were not in possession of the large amount of money they intended to launder, and therefore, could not believe that they had taken all of the necessary steps to finalize their money laundering schemes." *Alvarez,* 609 F. Supp. at 1316.  In the mail fraud conspiracy in *Alvarez* there was no similar required condition precedent. *Id.*  Similarly, here, all of the defendants completed all the acts necessary to provide material assistance to a terrorist organization – there was no condition precedent that needed have occurred.

[4]  Batiste makes an irrelevant and frivolous argument that because the government has previously correctly argued to this Court that the Indictment did not charge the defendants with treason, this Court should now ignore the dictates of the Guidelines requiring that the most analogous sentencing guideline, that is treason, be used where there is no guideline applicable for the crime of sedition.

A.    Basically, everything in general.  The brothers are strong
      men.  And, also, the thing I didn't like about is the fighting part. . .

                              . . .

Q.    Fighting whom, sir?
A.    . . . The only thing I never like about Brother Naz is the part of taking
      over.
Q.    Taking over what?
A.    The United States of America.  That's why I always think that's
      gonna get him in trouble.

On page 30 of the government's exhibit 47 and 47A, a tape recorded conversation of Batiste

and Ellie Assad, Batiste explained why he wanted to attack the United States as follows:

NB:    That is the only way, this government is evil, is of the devil.
       And the only way that purity can happen, unless the kingdom
       of Satan, which is this government, can be destroyed.

On March 24, 2006, Batiste told Ellie Assad in a tape recorded conversation which is Exhibit

44A, B and C at pages 25 and 25 as follows:

NB:    Are we're gonna burn Miami Beach?
CW2:   Brother, we, we'll burn. . . any chance we get, we'll do,. . .
NB:    (SC) We'll set it on fire, hah?
CW2:   . . . we will set on fire.
NB:    Good.
CW2:   You are enjoying a little bit. . . and we'll enjoy also.
(Driving sounds)
NB:    That's great.  I need this war to come on.

NB:    I'm ready for war.
CW2:   You are what?
NB:    I'm ready for war, I mean . . .

On December 16, 2005 in government's Exhibit 44A, B and C at page 25, Batiste, in his first

conversation with Ellie Assad, stated as follows:

CW:    But you have to tell me what in your mind.
NB:    We have to build.  We cannot build, we cannot convince, I cannot
       convince my people are already in the wrong religion who have forgotten

(UI) yourself.  Doesn't know anything about the true religion (UI).  I
cannot show them strength, I cannot show them power if I'm still weak
And talking about what we're gonna do.  They have to see that strong.
They have to see that we have boots, military uniform.  Have to see
We have great communications.  We have to see that we have access
To bring them to training grounds so they can train for guerilla
warfare.

And later in the same conversation:

> CW.    . . . What's your plan?
> NB:    To build Islam army.
> CW:    Army.  To build army.
> NB:    An Islamic army.  For Islamic jihad.
> CW:    Jihad.  Yeah.  Wage jihad.
> NB:    Yes.

It is clear, therefore, from Batiste's own words that his plan was to wage war with  the

United States.

> **2.      Defendants' claim of "double-counting" as a result of the 2-point
> specific offense characteristic pursuant to Section 2M5.3(b)(1)(E),
> are misplaced.**

Defendants improperly assert that they were subjected to a 2-point enhancement of their base

offense level pursuant to Section 2M5.3, which sets a base offense level of 26 for a conviction of

providing material support or resources to a designated foreign terrorist organization, or specially

designated global terrorists, or for a terrorist purpose.  This base offense level is increased by 2

levels pursuant to subsection (b)(1)(E), if the offense involved "funds or other material support or

resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in

the commission of a violent act."  This is a specific offense characteristic, not an enhancement, as

defendants claim.

Nonetheless, the evidence overwhelming showed that defendants provided themselves,

taking an oath of loyalty to Al Qaeda, in order to assist in the commission of a violent act, that is the

destruction of buildings and other terrorist acts.  There are numerous instances , as fully discussed and explained above, in which Batiste and the other defendants discuss their violent goals and intentions.

**III.**    **Defendants Do Not Meet their Burden of Proving that any Departure is Warranted.**

**A.**    **Batiste is not entitled to a downward departure U.S.S.G. Section 5K2.0.**[5]

Batiste unpersuasively argues that there exits "a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described" [§5K2.0] and that the unusual circumstances take the case outside of the "heartland" of cases contemplated by the standard range [*Koon*].  The "facts" presented by Batiste in support of this rare and unusual departure are: his efforts to be "gainfully employed", and "government overreaching" by "inducing" him to commit the crimes for which he was convicted.  These arguments are patently frivolous.  The jury soundly rejected this entrapment defense.  Further, as the wealth of evidence has shown in this case, Batiste was operating a fledgling construction company in order to provide work for himself and his soldiers to assist in his recruitment of other soldiers and in order to provide an appearance of legitimacy.  The government simply provided Batiste with what he was looking for, a connection to a terrorist organization to fund his terrorist agenda and activities.  There was no evidence of government "overreaching" or "inducement."  Indeed, defendants even kidnaped the informants to ensure that they weren't working for the government.

---

[5]  Batiste also argues that he is entitled to a downward departure based on U.S.S.G. Section 21.1(b)(2), which the government has addressed above in section II C 1 of this memorandum.

The government submits that the statutory maximum terms of imprisonment for each defendant is not only within each defendant's properly-calculated advisory Guidelines range, it is also reasonable and, in fact, demanded by the statutory sentencing factors under 18 U.S.C. § 3553. That statute provides that courts, in imposing a reasonable sentence, must consider, among other factors: (1) the applicable guidelines range; (2) the nature and circumstances of the offense; (3) the history and characteristic of the defendant; (4) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect of the law, and to provide just punishment for the offense; (5) the need for adequate deterrence; (6) the protection of the public; and (7) the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553. An explicit recitation of how the each defendant's sentence comports with each of these factors is not required; the sentencing court instead must acknowledge that it has considered the defendant's arguments in light of the aforementioned statutory sentencing factors, and has factored that analysis into the ultimate sentence. *See United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005) (per curiam); *United States v. Scott*, 426 F.3d 1324, 1329 (11th Cir. 2005).

In this Sentencing Memorandum, the government has laid out a wealth of evidence which contradicts defendants' claims for reductions and downward departures, and supports the imposition of sentences in accord with the Probation Office's guideline calculations. The imposition of statutory maximum sentences under the circumstances in this case will serve the ends of justice and deterrence, and signal that United States criminal courts are prepared to mete out strong punishment while applying the terrorism laws that Congress has enacted. Strong punishment for the defendants' material support crimes would deter others who would abuse the freedoms that the United States offers those who live here, and would further ensure that the United States does not become a haven

for supporters of violent jihad or violence of any stripe.

## Conclusion

For all of the foregoing reasons, the Court should (1) adopt the PSIs including their calculation of each defendant's advisory Guidelines range, (2) deny the defendants' requests for a departure from the properly-calculated Guidelines range, and (3) after considering the factors in 18 U.S.C. § 3553, impose upon each defendant the statutory maximum terms of imprisonment.


Respectfully submitted,
JEFFREY H. SLOMAN
ACTING UNITED STATES ATTORNEY


By: _S/ Jacqueline Arango_____
     JACQUELINE M. ARANGO
     ASSISTANT UNITED STATES ATTORNEY
     Florida Bar No. 664162
     99 N.E. 4th Street, 8th Floor
     Miami, Florida 33132
     (305) 961-9292/536-7213 (fax)
     e-mail: jacqueline.arango@usdoj.gov


By: _S/ Richard Gregorie_____
     RICHARD D. GREGORIE
     ASSISTANT UNITED STATES ATTORNEY
     Florida Bar No. 0549495
     99 N.E. 4th Street, 7th Floor
     Miami, Florida 33132
     (305) 961-9148/536-7213 (fax)
     e-mail: dick.gregorie@usdoj.gov

## Certificate of Service

I HEREBY CERTIFY that on November 16, 2009, I electronically filed the foregoing document, **Government's Sentencing Memorandum and Response to defendants' Ojections to the PreSentence investigation Reports** with the Clerk of the Court using CM/ECF.

S/ Jacqueline Arango
Jacqueline Arango
Assistant United States Attorney